UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

VIABLE RESOURCES, INC.,

    Plaintiff,

v.                                                                                 Case No: 8:16-cv-2669-T-30JSS

KAREN BELYEA,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS MATTER is before the Court on Plaintiff's Motion for Preliminary Injunction. (Dkt. 3.) Plaintiff, Viable Resources, Inc., moves for a preliminary injunction to enjoin Defendant, Karen Belyea, its former employee, from certain conduct violating Ms. Belyea's employment agreement. The Court held an evidentiary hearing on this matter on October 20, 2016, and November 8, 2016. For the reasons that follow, it is recommended that Plaintiff's Motion for Preliminary Injunction be denied.

## BACKGROUND

Plaintiff, Viable Resources, Inc. ("VR"), is a Sarasota corporation that provides call center professional services and other telecommunications services. VR is led by its chief executive officer, Timothy Gannon, and vice president of operations, Ann Foote. Primarily, VR serves as an Avaya "business partner" or "reseller" by selling Avaya products and services to other resellers, including, among others, SunTrust, Cincinnati Bell Technology Solutions ("CBTS"), and AGC Networks Limited ("AGC"). In January 2006, VR hired Defendant, Karen Belyea, as an entry-level computer-telephone-integration developer ("CTI Developer II"). (Dkt. 13-2 ¶ 6.) In March 2006, Ms. Belyea executed an Employment Agreement that included, among other things,

confidentiality and non-competition provisions. (Dkt. 1, Ex. B ¶¶ 5, 6, 7, 9, 10.) These provisions required that Ms. Belyea preserve trade secrets, preserve confidential and proprietary information, and refrain from engaging in any work materially similar to the work performed by VR during her employment and for twenty-four months following the termination of the Employment Agreement. Ms. Belyea executed the Employment Agreement on March 7, 2006. (Dkt. 1, Ex. B.)

In October 2015, Ms. Belyea resigned from her employment with VR and, in November 2015, became employed by Hayes e-Government Resources, Inc. ("Hayes"), VR's customer and competitor, as a software engineer. (Dkt. 1-8 ¶ 4); (Dkt. 13.) Hayes is led by its chief executive officer and president Karen Hayes. On August 18, 2016, VR sent Ms. Belyea a letter reminding her of the Employment Agreement, noting that her employment with Hayes was a direct violation of her Employment Agreement and requesting a written commitment from Ms. Belyea that she would abide by the terms of the Employment Agreement. As of this date, Ms. Belyea has not provided the requested written commitment and remains employed by Hayes. According to VR, Ms. Belyea is using VR's trade secrets and proprietary information to assist Hayes, soliciting and assisting customers of VR while employed by Hayes, and disclosing proprietary and confidential information regarding VR's current and prospective customers. (Dkt. 2.)

Accordingly, on September 9, 2016, VR filed a Verified Complaint for Injunctive Relief and Damages against Ms. Belyea, alleging breach of contract (Count I), violation of the Florida Uniform Trade Secrets Act (Count II), tortious interference with business relations (Count III), and unjust enrichment (Count IV) in connection with Ms. Belyea's resignation from VR and subsequent employment with Hayes. (Dkt. 2.) Simultaneous to the filing of the Complaint, Plaintiff filed the instant Motion for Preliminary Injunction. (Dkt. 3.)

**APPLICABLE STANDARDS**

The decision to grant or deny a preliminary injunction is within the discretion of the district court. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). To obtain a preliminary injunction, the movant must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) the injunction, if issued, would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (internal citation and quotation omitted). The sole function of an action for injunction is to forestall future violations. *United States v. Oregon State Med. Soc.*, 343 U.S. 326, 333 (1952). As such, it cannot serve as a sanction for past conduct that may be addressed by adequate remedies at law. *Alabama v. U.S. Army Corps of Eng'rs.*, 424 F.3d 1117, 1133 (11th Cir. 2005). Most importantly, however, a preliminary injunction serves a limited purpose to "preserve the relative positions of the parties until a trial on the merits can be held," and "the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *United States v. Lambert*, 695 F.2d 536, 539–40 (11th Cir. 1983).

**ANALYSIS**

VR moves to enjoin Ms. Belyea from working for Hayes and from disclosing VR's confidential, proprietary, and trade secret information. VR argues that Ms. Belyea breached the Employment Agreement when she joined Hayes and that she will continue to breach the

Employment Agreement if she is not ordered to stop working for Hayes. Additionally, VR claims that Ms. Belyea interfered with VR's business relationships with SunTrust, CBTS, and AGC. (Dkt. 3.) In response, Ms. Belyea argues that the Employment Agreement is unenforceable because it is not supported by consideration. Nevertheless, Ms. Belyea denies the allegations and argues that VR has failed to provide any evidence that she misappropriated trade secrets or solicited business from SunTrust, CBTS, or AGC, and a preliminary injunction is not warranted because she is no longer providing services to those customers.

### A.  Substantial Likelihood of Success on the Merits

To obtain preliminary injunctive relief, the movant must first demonstrate a substantial likelihood of prevailing on at least one of the causes of action it has asserted. *U.S. Army Corps of Eng'rs.*, 424 F.3d at 1134. Stated otherwise, the movant must show that it has a substantial likelihood of success on the merits of the underlying case when the case is ultimately tried. *Id.* at 1128. A substantial likelihood of success on the merits requires a showing of only likely or probable, rather than certain, success. *Schiavo ex rel. Schindler v. Schiavo*, 357 F. Supp. 2d 1378, 1383 (M.D. Fla.), *aff'd*, 403 F.3d 1223 (11th Cir. 2005).

#### 1.  Breach of Contract

In Count I, VR alleges that Ms. Belyea breached her Employment Agreement by working for Hayes, soliciting VR's current and prospective customers, and using or disclosing VR's confidential, propriety, and trade secret information. (Dkt. 2 ¶¶ 36–40.) The Employment Agreement at issue contains a choice-of law provision specifying that the agreement is governed by Washington law. (Dkt. 1, Ex. B ¶ 14.) In diversity cases, the choice-of-law rules of the forum state determine what law governs, *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013), and, under Florida law, courts enforce choice-of-law provisions

unless the law of the chosen forum contravenes strong public policy, *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000). The term "strong public policy" means that "the countervailing public policy must be sufficiently important that it outweighs the policy protecting freedom of contract." *Mazzoni*, 761 So. 2d at 312.

Under both Florida and Washington law, restrictive covenants in employment contracts are enforceable so long as the restrictions are reasonable in scope and are reasonably necessary to protect a legitimate business interest of the employer. § 542.335(1), Fla. Stat.; *Wood v. May*, 438 P.2d 587, 590 (Wash. 1968). Additionally, although Washington law differs from Florida law on whether continued employment serves as adequate consideration for a non-compete agreement, neither party argues that the application of Washington law to this matter would contravene strong public policy. Therefore, in this case, Washington law applies to the determination of whether Plaintiff has established a substantial likelihood on the merits of its claim that Ms. Belyea breached the Employment Agreement.

Under Washington law, non-compete agreements are enforced when such agreements are "validly formed and are reasonable." *Labriola v. Pollard Grp., Inc.*, 100 P.3d 791, 793 (Wash. 2004). To be validly formed, a non-compete agreement must be supported by consideration. Consideration exists for an employment contract either when an employee enters into a non-compete agreement when he or she is "first hired," or, if entered into after employment has commenced, when there is independent consideration at the time the agreement is reached. *Id.* at 794. In this case, Ms. Belyea was first hired by VR in June or July 2005 as a part-time hourly-wage employee and then became a full-time salaried employee in January 2006. But Ms. Belyea did not sign the non-compete agreement until March 2006—three months after she began work as a full-time employee. Given this three-month lapse, the Court finds that Ms. Belyea did not enter

into the non-compete agreement when she was "first hired." *See Gress v. Conover Ins., Inc.*, 494 F. App'x 772, 774 (9th Cir. 2012) (finding that a non-competition clause included in an employment agreement was enforceable when the agreement was signed at the time of the employee's initial hiring); *Omega Morgan, Inc. v. Heely*, No. C14-556RSL, 2015 WL 1954653, at *3 (W.D. Wash. Apr. 29, 2015) (finding that an agreement signed during the first two weeks of employment was signed when the employee was "first hired"); *Int'l Paper Co. v. Stuit*, No. C11-2139JLR, 2012 WL 1857143, at *4 (W.D. Wash. May 21, 2012) (finding that a confidentiality agreement signed several years after being employed must be supported by independent consideration); *Nw. Mobile Servs., L.L.C. v. Schryver Med. Sales & Mktg., Inc.*, No. C06-5227 RBL, 2006 WL 1799620, at *2 (W.D. Wash. June 28, 2006) (finding that a non-compete agreement was supported by consideration when it was signed within a week of the date the employee commenced work as an at-will employee); *Labriola*, 100 P.3d at 794 (finding that a non-compete agreement signed nearly five years after beginning work for the employer lacked consideration).

Therefore, for the non-compete agreement to be enforceable, it must be supported by independent consideration. To determine whether an agreement is supported by independent consideration, the court compares the nature of the employer-employee relationship before and after contracting. *Int'l Paper Co.*, 2012 WL 1857143, at *4. Independent consideration "requires the employer to undertake an obligation or promise, other than continuing employment, that it was not previously required to undertake," *McKasson v. Johnson*, 315 P.3d 1138, 1141–42 (Wash. Ct. App. 2013), including wages, a promotion, a bonus, or access to protected information, *Labriola*, 100 P.3d at 791. "[M]ere continuing employment, without any new promise or benefit by the

employer, is not sufficient consideration when an existing employee agrees to a noncompete restriction." *McKasson*, 315 P.3d at 1142 n.4.

At the hearing, VR's counsel argued, and Ms. Belyea did not dispute, that Ms. Belyea received additional benefits and a salary when she became a full-time employee in January 2006. The issue, however, is whether VR gave Ms. Belyea additional consideration at the time the non-compete agreement was reached. A comparison of Ms. Belyea's employment status before and after the non-compete agreement was reached confirms that Ms. Belyea received the same compensation and benefits before and after she signed the non-compete agreement. Further, although VR argues that Ms. Belyea received specialized training during her employment, and that such training served as consideration for her promise to not compete, VR failed to show that Ms. Belyea was promised or received additional training in exchange for her promise to not compete. Indeed, Ms. Belyea and Ms. Foote testified that Ms. Belyea gained additional skills and advanced her existing skills by virtue of her continued employment and the availability of courses provided by Avaya to VR's employees. The evidence therefore confirms Ms. Belyea's statement that her skills increased over time in a customary manner. *See Copier Specialists, Inc. v. Gillen*, 887 P.2d 919, 920 (Wash. Ct. App. 1995) ("[Generally,] skills acquired by an employee during his or her employment do not warrant enforcement of a covenant not to compete."). Nevertheless, even assuming that the training Ms. Belyea acquired during her employment constitutes independent consideration, such training, without more, does not warrant enforcement of the covenant not to compete. *Id.*

In sum, Ms. Belyea merely continued her employment after signing the non-compete agreement, and there is no indication that she incurred additional obligations or duties not otherwise undertaken by her prior to executing the non-compete agreement. Nor is there any

indication that VR made additional promises to Ms. Belyea in exchange for her promise to not compete. Therefore, because the non-compete agreement is not supported by consideration, it cannot be enforced against Ms. Belyea. As such, VR failed to demonstrate a substantial likelihood of prevailing on its breach of contract claim.

### 2. Florida Uniform Trade Secrets Act

In Count II, VR alleges that Ms. Belyea has disclosed or used certain trade secrets belonging to VR while employed by Hayes and to Hayes' benefit and that such disclosure constitutes misappropriation of proprietary information and trade secrets under the Florida Uniform Trade Secrets Act, §§ 688.001–.009. (Dkt. 2 ¶¶ 41–45.)

In Florida, a trade secret consists of information that: (1) derives economic value from not being readily ascertainable by others; and (2) is the subject of reasonable efforts to maintain its secrecy. *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (citing Florida Statutes Section 688.002(4)). Under the Florida Uniform Trade Secrets Act, "[a]ctual or threatened misappropriation [of a trade secret] may be enjoined." § 688.003(1), Fla. Stat. Misappropriation includes the disclosure or use of a trade secret of another, without express or implied consent, by a person who: (1) used improper means to acquire knowledge of the trade secret; or (2) knew or had reason to know, at the time of disclosure or use, that her or his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use. § 688.002(2), Fla. Stat.

To prove a claim under the Florida Uniform Trade Secrets Act, a plaintiff must show that: (1) the plaintiff possessed secret information and took reasonable steps to protect its secrecy; and

(2) the secret it possessed was misappropriated. *Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006) (citing *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001)). In a trade secret action, the plaintiff bears the burden of demonstrating both that the specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy. *Am. Red Cross*, 143 F.3d at 1410. Information generally known or readily accessible to third parties cannot qualify for trade secret protection. *Id.* Moreover, "an employer may not preclude its former employee from 'utilizing contacts and expertise gained during his former employment.'" *Id.* (quoting *Templeton v. Creative Loafing Tampa, Inc.*, 552 So. 2d 288, 290 (Fla. 2d DCA 1989)).

In this case, the proffered evidence fairly reveals that VR maintains customer lists, customer goodwill, and pricing information that may properly be considered trade secret information that VR attempts to protect through the use of employment contracts and restrictive covenants such as the one at issue in this case. But the evidence also showed that VR selectively enforced its non-compete agreements. For example, Mr. Gannon testified that he enforced agreements differently depending on whether the departing employee sought employment that could benefit VR—a win-win situation, according to Mr. Gannon. Indeed, upon learning of Ms. Belyea's intent to leave VR, Mr. Gannon encouraged Ms. Belyea to seek employment with CBTS, and he was willing to waive the non-compete and non-solicitation provisions of her Employment Agreement if she accepted the position with CBTS. As such, it appears that VR guarded its trade secrets less vigorously when a departing employee sought to use information or skills to VR's benefit in subsequent employment. Given the limited evidence presented on this issue and at this stage in the proceedings, it cannot be said that VR took reasonable steps to protect the secrecy of its information.

Additionally, VR argues that the specialized skills of its employees acquired through their employment constitute a trade secret. However, even assuming that this information can be considered a trade secret, the evidence failed to establish Ms. Belyea's actual use of proprietary or confidential information at Hayes. At the hearing, VR explained that Ms. Belyea, and all other VR employees, observed how projects were completed through "ride alongs" with senior employees. Ms. Belyea was also given access to training courses provided by Avaya and other providers. These training courses were available to all VR employees and allowed employees to obtain certifications often required or preferred by customers. But these training courses, provided by Avaya through VR, were also accessible by employees of other Avaya-associated companies, such as Hayes, and were provided at the employees' option. Thus, the evidence showed that the training Ms. Belyea received during her employment with VR was optional, available to all VR employees and Avaya-affiliated providers, and customary within the telecommunications industry.

In terms of scopes of work, Ms. Belyea concedes that she was privy to VR's cost structure while she was employed at VR. But Ms. Hayes testified that Ms. Belyea did not disclose or use information related to pricing during her employment with Hayes. Rather, Ms. Hayes testified that Ms. Belyea's position at Hayes is strictly related to software engineering and performing work under Hayes' contract with the State of Florida's "STEPS" program. (Dkt. 13-2.) Although Ms. Belyea was asked occasionally to estimate the expected duration of a project, the evidence did not establish that this occurred on a recurring basis or that Ms. Belyea disclosed VR's confidential or proprietary information to assist Hayes in creating pricing or cost projections. *See Lee v. Cercoa, Inc.*, 433 So. 2d 1, 2 n.1 (Fla. 4th DCA1983) (providing that although an employee is under a duty not to disclose skills, techniques, or processes developed by an employer and acquired during the course of employment, this does not preclude a former employee from using, in competition with

his or her former employer, "methods of doing business and processes which are but skillful variations of general processes known to the particular trade"). Nevertheless, as Ms. Belyea noted, the information used to create scopes of work changes at a rapid rate—technology frequently changes, and the price of a given service fluctuates over time. As such, it is unlikely that pricing information Ms. Belyea acquired during her employment with VR could be implemented by Hayes. In short, VR failed to establish an essential element of a claim under the Florida Uniform Trade Secrets Act—that Ms. Belyea disclosed trade secret information belonging to VR. Therefore, VR failed to demonstrate a substantial likelihood of prevailing on its claim under the Florida Uniform Trade Secrets Act.

### 3. Tortious Interference with Business Relations

In Count III, VR alleges that Ms. Belyea knew of VR's business relationships with its customers—namely SunTrust, CBTS, and AGC—through her employment with VR and acted to deprive VR of its existing business relationships by dealing with such customers, in violation of her Employment Agreement and other legal obligations. (Dkt. 2 ¶¶ 46–52.)

Under Florida law, the elements of a cause of action for tortious interference with a business relationship are: (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994). To show intentional and unjustified interference, a plaintiff must prove that the defendant "'manifested a specific intent to interfere with the business relationship.'" *MKT Reps S.A. DE C.V. v. Standard Chartered Bank Int'l (Americas) Ltd.*, 520 F. App'x 951, 954 (11th Cir. 2013)

(quoting *Fiberglass Coatings, Inc. v. Interstate Chem., Inc.*, 16 So. 3d 836, 838 (Fla. 2d DCA 2009)).

At the hearing, VR established that it had a business relationship with SunTrust, CBTS, and AGC. *See Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 821 (Fla. 1996) ("[I]n order to establish the tort of tortious interference with a business relationship, the plaintiff must prove a business relationship with identifiable customers."). Notably, however, Ms. Hayes testified that Hayes also maintains relationships with SunTrust, CBTS, and AGC, and that those relationships originated before Ms. Belyea became employed with Hayes. Nevertheless, VR established, and Ms. Belyea does not dispute, that Ms. Belyea performed work for SunTrust, CBTS, and AGC while she was employed at Hayes. But VR did not establish that Ms. Belyea intentionally or unjustifiably interfered with VR's relationship with SunTrust, CBTS, or AGC. *See Smith v. Ocean State Bank*, 335 So. 2d 641, 643 (Fla. 1st DCA 1976) ("One is liable for commission of this tort who interferes with business relations of another, both existing and prospective, by [inducing] a third person not to enter into or continue a business relation with another or by preventing a third person from continuing a business relation with another."). Indeed, VR presented no evidence regarding Ms. Belyea's intent to deprive VR of its relationship with SunTrust, CBTS, or AGC.

Although VR presented evidence that VR's business with SunTrust, CBTS, and AGC has declined since Ms. Belyea's departure, VR presented no evidence to show that Ms. Belyea engaged in any activity to solicit SunTrust, CBTS, or AGC or that she otherwise intended to deprive VR of its relationship with them. Indeed, no evidence was presented to show that Ms. Belyea induced VR's customers to work with Hayes or to show that Ms. Belyea intended to deter SunTrust, CBTS, or AGC from working with VR. Rather, Mr. Gannon merely testified that customers asked to

work specifically for Ms. Belyea and that, absent Ms. Belyea, those customers would not have contacted Hayes. Additionally, Ms. Belyea and Ms. Hayes testified that Ms. Belyea does not receive a bonus or additional compensation for bringing customers or sales to Hayes, which suggests a lack of incentive for Ms. Belyea to solicit VR's customers. (Dkt. 13-2.) At best, the evidence suggests that customers followed Ms. Belyea to Hayes because of her knowledge and experience in the telecommunications field. And, most notably, Ms. Belyea and Ms. Hayes both stated that Ms. Belyea is no longer working with SunTrust, CBTS, or AGC, and she will continue to refrain from engaging in working with them for the duration of this lawsuit. (Dkt. 13-2.) Therefore, as Ms. Belyea argues, a preliminary injunction is not warranted to prevent Ms. Belyea from engaging in conduct that will no longer occur.

### 4. Unjust Enrichment

In Count IV, Plaintiff alleges that Ms. Belyea benefited from the use of trade secrets and confidential information belonging to VR and that the benefit conferred on her was unjust in that it was not paid for by her. (Dkt. 2 ¶¶ 53–55.)

To succeed on a claim for unjust enrichment, a plaintiff must show that: (1) it conferred a benefit on the defendant of which the defendant is aware; (2) the defendant voluntarily accepted and retained the benefit conferred; and (3) the circumstances would make it inequitable for the defendant to retain the benefit without paying for it. *Nova Info. Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006–07 (11th Cir. 2004).

As stated above, VR failed to show that Ms. Belyea used or retained trade secrets or confidential information belonging to VR. Therefore, VR cannot establish the elements necessary to succeed on a claim for unjust enrichment, namely that Ms. Belyea retained the benefit of VR's trade secret and confidential information.

### B. Irreparable Harm

Because a showing of irreparable injury is "the sine qua non of injunctive relief," *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990), the absence of a substantial likelihood of irreparable injury, standing alone, makes preliminary injunctive relief improper, *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000). To qualify as irreparable, the injury or harm must be actual and imminent, not remote or speculative, and it must be shown that the injury cannot be undone through monetary remedies. *City of Jacksonville*, 896 F.2d at 1285 (internal citation and quotation omitted). Indeed, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). "Conjecture about a possibility of difficulties with damage computations is inadequate to support an injunction before trial." *City of Jacksonville*, 896 F.2d at 1286.

Having found that VR has not shown a substantial likelihood of success on the merits, the Court need not analyze the remaining elements of the test for issuance of a preliminary injunction *See Dawson v. Ameritox, Ltd.*, 571 F. App'x 875, 880 (11th Cir. 2014) ("[B]ecause the district court found [that the party seeking a preliminary injunction] failed to meet its burden on the first prerequisite, it did not need to address the other elements."). Nonetheless, at this time, VR cannot demonstrate a threat of continuing irreparable harm. Ms. Belyea has agreed to refrain from working with SunTrust, CBTS, and AGC for the duration of this lawsuit. Additionally, Mr. Gannon testified that the harm caused to VR by Ms. Belyea's alleged conduct is merely difficult to quantify, and VR did not sufficiently establish that such harm is "actual and imminent." Rather, it appears, as Ms. Belyea contends, that the harm alleged has already occurred. Moreover, although

the loss of customers and goodwill can be an irreparable injury, *BellSouth Tellecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 970 (11th Cir. 2005), VR's conclusory statement that its revenue with certain customers has declined since Ms. Belyea's departure is insufficient to show a substantial likelihood of irreparable injury. Similarly, it has not been shown that VR's loss of goodwill has or will result in substantial injury to VR. Nevertheless, VR's alleged loss of business can be remedied by money damages.

### C. Balance of Harms

Third, the movant must show that its own injury outweighs whatever damage the proposed injunction would cause the opposing party. In balancing the harm the issuance of an injunction may cause either party, "the harm considered by the district court is necessarily confined to that which might occur in the interval between ruling on the preliminary injunction and trial on the merits." *Lambert*, 695 F.2d at 540.

At the hearing, Ms. Belyea testified that the issuance of a preliminary injunction would effectively prevent her from supporting her family, as she is the primary income provider for her family. VR, on the other hand, argues that, in the absence of a preliminary injunction, VR would lose customers as a result of Ms. Belyea's employment with Hayes, which is especially harmful given that VR is a small, family business that relies on its business relationships to continue its operations. On balance, the Court finds that the harm caused to Ms. Belyea by restricting her from competing with VR by virtue of her employment with Hayes—without an enforceable non-compete agreement—outweighs the speculative harm caused to VR by Ms. Belyea's employment with Hayes. Notably, as stated above, Ms. Belyea has ceased performing work with SunTrust, CBTS, and AGC and does not intend to perform work for them during this lawsuit. Additionally,

without sufficient evidence that Ms. Belyea disclosed or used VR's confidential business information in her employment with Hayes, the balance of harms weighs in Ms. Belyea's favor.

### D. Public Interest

In a case where the movant has failed to show a likelihood of establishing that the restrictive covenant provisions contained are valid and enforceable to protect any legitimate business interests or that those provisions were breached, the refusal to enforce the restrictive covenants does not disserve the public interest. *GPS Indus., LLC v. Lewis*, 691 F. Supp. 2d 1327, 1339 (M.D. Fla. 2010). Rather, in such cases, the refusal serves the public interest by disallowing unreasonable restrictive covenants to unfairly restrain trade. *Id.* In this case, VR has failed to show that the non-compete agreement is enforceable against Ms. Belyea or that Ms. Belyea misappropriated trade secrets, unjustifiably interfered with VR's business relationships, or benefited from the use of VR's trade secrets. In light of this, the public interest would not be served by the issuance of a preliminary injunction. Accordingly, it is **RECOMMENDED** that Plaintiff's Motion for Preliminary Injunction (Dkt. 3) be **DENIED**.

**IT IS SO REPORTED** in Tampa, Florida, on December 1, 2016.

_____
JULIE S. SNEED
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or

legal conclusion the district judge adopts from the Report and Recommendation.  *See* 11th Cir. R. 3-1.

Copies furnished to:
The Honorable James S. Moody, Jr.
Counsel of Record